UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                             :

BRISTOL-MYERS SQUIBB COMPANY,     :

                                             :          12 Civ. 5846 (PAE)

                           Plaintiff,    :

                                             :          OPINION & ORDER

              -v-                              :

                                             :

MATRIX LABORATORIES LIMITED, *now known as*   :
*Mylan Laboratories Limited*,                 

                                             :

                           Defendants.   :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Bristol-Myers Squibb Company ("BMS") brings this breach of contract action against defendant Matrix Laboratories Limited ("Matrix"). Matrix moves to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), arguing that this Court lacks personal jurisdiction over Matrix and that the Amended Complaint fails to state a claim for breach of contract. BMS opposes the motion and seeks leave to take jurisdictional discovery in the event the Court finds personal jurisdiction lacking. For the reasons that follow, the Court finds that BMS has made a *prima facie* showing of personal jurisdiction. However, Matrix's motion to dismiss is granted because the Amended Complaint fails to state a claim. BMS's request to take jurisdictional discovery is denied as moot.

**I.      Background**[1]

     **A.      Factual Background**

BMS is a Delaware corporation with its principal place of business in New York. Am. Compl. ¶ 15. It sells the well-known HIVS/AIDS drug atazanavir under the brand name Reyataz. It has patents or pending patent applications related to atazanavir in more than 50 countries. *Id.* ¶ 1 & n.1. Matrix is an Indian corporation with its principal place of business in India. *Id.* ¶ 16. It is one of the world's largest generic drug manufacturers. It is in the business of manufacturing, marketing, and selling generic pharmaceutical products throughout the United States. *Id.*

On April 17, 2011, BMS and Matrix entered into an "immunity from suit" agreement (the "Agreement"), which is at the heart of this litigation. The Agreement granted Matrix the right to manufacture, distribute, and sell generic atazanavir in certain underdeveloped countries without fear of patent litigation by BMS. *Id.* ¶¶ 2, 30. BMS agreed to forego any royalties or profits associated with Matrix's sale of generic atazanavir under the Agreement, and BMS provided the manufacturing technology necessary to allow Matrix to produce the drug on its own. *Id.* ¶¶ 3–4. The purpose of the Agreement was to facilitate broad low-cost distribution of generic atazanavir to areas in dire need of HIV/AIDS treatment and prevention. *Id.* ¶ 2.

Significant here, the Agreement immunizes Matrix's sale of generic atazanavir only in the "Territory," which is defined to include India and 48 countries in sub-Saharan Africa. *See* Agreement § 1.10 & App. C. The Territory does not include Venezuela. *Id.*; Am. Compl. ¶¶ 29, 31. In November 2011, Matrix asked BMS to consent to Matrix's selling generic atazanavir in

---

[1] The Court's account of the underlying facts of this case is drawn from the Amended Complaint (Dkt. 17) ("Am. Compl.") and the parties' contract (the "Agreement"), which is incorporated by reference in the Amended Complaint and attached as Exhibit 1 thereto. The facts regarding personal jurisdiction, and the evidence relevant to that issue, are discussed in Part II, *infra*.

Venezuala. BMS did not consent, however, because BMS had supplied Reyataz to Venezuela for several years and had two patent applications pending in Venezuela at the time of Matrix's request. *Id.* ¶¶ 5, 31–32. Twice more in early 2012, Matrix sought BMS's consent to Matrix's engaging in such sales, but BMS again declined. *Id.* ¶¶ 6–8.

Nevertheless, in February 2012, Matrix sold a significant amount of generic atazanavir, estimated as a one-year's supply, to the Pan American Health Organization ("PAHO"), allegedly knowing that PAHO would then distribute it in Venezuela. *Id.* ¶¶ 9, 33. This product later was shipped to the Venezuelan Ministry of Health and sold throughout Venezuela. *Id.* ¶¶ 9, 12, 35. BMS alleges that Matrix's sale to PAHO was in breach of the Agreement. BMS alleges that PAHO's ensuing sales within Venezuela caused BMS to lose a year's worth of sales of branded Reyataz to Venezuela, causing estimated damages of $15 million. *Id.* ¶¶ 14, 36.

**B.    Procedural History**

On July 30, 2012, BMS filed the original Complaint. Dkt. 1. On March 4, 2013, after the parties stipulated to several extensions of Matrix's time to answer or otherwise respond to the Complaint, *see* Dkt. 4–6, Matrix filed a motion to dismiss, arguing that this Court lacks personal jurisdiction over Matrix and that the Complaint fails to state a claim for breach of contract. Dkt. 11. On April 16, 2013, BMS filed an Amended Complaint. Dkt. 17.

On May 15, 2013, Matrix filed the pending motion to dismiss, Dkt. 18; a memorandum of law in support of that motion, Dkt. 19 ("Matrix Br."); and two declarations in support of that motion, Dkt. 20, 21 (Declaration of Rajeev Mukundan ("Mukundan Decl.")). In that motion, Matrix again argues that the Court lacks personal jurisdiction, *see* Matrix Br. 8–21, and that the Amended Complaint fails to state a claim for breach of contract, *see id.* at 21–25. On June 10, 2013, BMS filed a cross-motion for jurisdictional discovery, Dkt. 23; a memorandum of law in

opposition to Matrix's motion and in support of BMS's request for jurisdictional discovery, Dkt. 25 ("BMS Br."); and a declaration in opposition to Matrix's motion and in support of BMS's motion, Dkt. 24.  On June 27, 2013, Matrix filed a memorandum of law, Dkt. 27 ("Matrix Reply Br."), and a declaration, Dkt. 28, in further support of its motion and in opposition to BMS's motion.  On July 8, 2013, BMS filed a memorandum of law in further support of its motion for jurisdictional discovery.  Dkt. 29 ("BMS Reply Br.").

## II.     Personal Jurisdiction

Matrix first moves to dismiss the Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2).  *See* Matrix Br. 8–21; Matrix Reply Br. 4–22.  BMS opposes that motion.  It requests leave to take jurisdictional discovery in the event the Court finds personal jurisdiction lacking.  *See* BMS Br. 4–21; BMS Reply Br. 1–10.

### A.     Applicable Legal Standard

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Secs, Inc. v. Banco BRJ, S.A.*, No. 12-770-cv, 2013 WL 3335784, at *3 (2d Cir. July 3, 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations."  *Id.* (quoting *Ball*, 902 F.3d at 197); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to

4

survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (citation omitted)).

"This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, *supra*, at *3 (quoting *S. New Eng. Tel.*, 624 F.3d at 138); *accord A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citation omitted)). Nevertheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *accord Licci ex rel. Licci v. Lebanese Canadian Bank*, 673 F.3d 50, 59 (2d Cir. 2012).

### B. Discussion

The amenability of a foreign corporation, such as Matrix, to suit in federal court in a diversity action is determined in accordance with the law of the forum state—here, New York. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "[I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's

assertion of jurisdiction under these laws comports with the requirements of due process." *Metro Life Ins.*, 84 F.3d at 567; *accord Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007).

Under New York C.P.L.R. § 301, a foreign corporation is subject to general jurisdiction in New York courts "if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990) (citation omitted); *accord Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) ("New York courts may exercise personal jurisdiction over a foreign corporation that is engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in the state, even if the cause of action is unrelated to the defendant's New York activities." (citations and alterations omitted)). "The test for 'doing business' is a simple and pragmatic one, which varies in its application depending on the particular facts of each case. The court must be able to say from the facts that the corporation is 'present' in the State not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Res. Corp.*, 77 N.Y.2d at 33–34 (citations and alterations omitted); *accord Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2010).

"The New York courts, in applying the pragmatic test for section 301 jurisdiction, have focused upon factors including: the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985); *accord Wiwa*, 226 F.3d at 98. Although "[s]olicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services, . . . when there are activities of

6

substance in addition to solicitation there is presence and, therefore, jurisdiction." *Laufer v. Ostrow*, 55 N.Y.2d 305, 310 (1982); *see Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1044 (2d Cir. 1990) ("Under this 'solicitation-plus' rule, once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.'" (citation omitted)).

Here, BMS alleges that Matrix markets and sells generic pharmaceutical products throughout the United States, including in New York, *see* Am. Compl. ¶ 16, and that Matrix derives substantial revenues from its sales in New York, *see id.* ¶ 19. Although the extent of Matrix's sales is unclear, Matrix is alleged to be one of the world's largest generic drug manufacturers, *see id.* ¶ 16, and Matrix's business activities in New York allegedly include the sale of generic versions of Lipitor and other products, *see id.* ¶ 21. BMS further alleges that Matrix regularly conducts business with at least one New York corporation, BMS, and entered into a contract with BMS governed by New York law. *Id.* ¶ 20.

To be sure, the Amended Complaint contains its fair share of legal conclusions, *see, e.g.*, *id.* ¶ 19 ("Defendant also has continuous and systematic contacts with this judicial district . . . ."), and many allegations are made on information and belief. However, considering the Amended Complaint's specific factual allegations together and construing them in the light most favorable to BMS, the Court finds that the Amended Complaint contains "an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New Eng. Tel.*, 624 F.3d at 138.[2] BMS's allegations of Matrix's substantial solicitation of business in New York,

---

[2] The Court emphasizes that this holding is based on Matrix's activities in and specifically directed towards New York, not on BMS's broader allegations that Matrix, through affiliate entities, placed goods into the United States' "stream of commerce" that found their way to New York. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2855 (2011) ("Flow of a manufacturer's products into the forum . . . may bolster an affiliation germane to

revenues derived from sales in New York, and ongoing business relationships with New York companies suffice at this stage of the proceedings.

Matrix argues that "BMS's speculation and conclusory assertions regarding [Matrix]'s supposed New York contacts are contradicted by the facts set forth" in the declaration of Matrix's General Counsel, Rajeev Mukundun. Matrix Br. 13. Mukundun asserts that Matrix is not licensed in New York, and has no offices, factories, or employees in New York. Mukundun Decl. ¶ 3. These are highly relevant factors, *see Hoffritz*, 763 F.3d at 58, and BMS does not appear to dispute those assertions. However, many of Mukundun's other assertions are directly contrary to the allegations in the Amended Complaint that establish a *prima facie* showing of personal jurisdiction. For instance, Mukundun states that Matrix does not actively solicit business in New York and that Matrix does not sell the generic version of Lipitor in New York. Mukundun Decl. ¶¶ 3, 7. He represents that Matrix does not sell any drugs in their finished dose

---

*specific* jurisdiction. . . . But ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant."); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). Nor does the Court rely on BMS's argument that it has sufficiently alleged that Matrix is a "mere department" of its domestic parent, Mylan Inc., and that Mylan's New York contacts justify the exercise of jurisdiction over Matrix. BMS Br. 9–13; BMS Reply Br. 4–5; *see Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) (setting forth factors to be considered when determining whether to exercise personal jurisdiction over foreign parent corporation based on activities of its domestic subsidiary). This claim is unpersuasive. *See, e.g.*, *Jazini*, 148 F.3d at 185 (conclusory allegations that domestic subsidiary was "wholly controlled" by foreign parent and "wholly dependent" upon parent for business plan and financing, that executive director of parent was chairman of subsidiary, and that annual report showed that parent's president wanted subsidiary to "focus on contributing to the company as a whole" insufficient to make out *prima facie* case of personal jurisdiction over foreign parent); *Arquest, Inc. v. Kimberly-Clark Worldwide, Inc.*, No. 07 Civ. 11202 (CM), 2008 WL 2971775, at *9 (S.D.N.Y. July 31, 2008) ("[I]n addition to common ownership, there must be a disregard for separate corporate existence."); *Giar v. Centea*, No. 02 Civ. 7916 (LLS), 2003 WL 1900836, at *1–2 (S.D.N.Y. Apr. 16, 2003) (allegations that subsidiary was 99.6% owned by parent, shared some directors, and followed parent's policies "show no more than the normal business influence of a corporate parent; they fall far short of the pervasive control over the subsidiary that the 'mere department' standard requires"), *aff'd*, 86 F. App'x 461 (2d Cir. 2004) (summary order).

form to New York customers, and that of the approximately 75 active pharmaceutical ingredients sold by Matrix, only one was sold to a New York-based company, and one was sold to a New Jersey-based company with a delivery address in New York. *Id.* ¶ 4. He represents that Matrix's sales in New York account for only .05% of Matrix's annual revenue. *Id.* ¶ 5.

At this initial stage of the proceedings, however, Mukundun's declaration does not defeat BMS's *prima facie* showing of jurisdiction. Matrix cites *Schenker v. Assicurazioni Generali S.p.A., Consol.*, No. 98 Civ. 9186 (MBM), 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002), for the proposition that "where . . . defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that evidence—the allegation may be deemed refuted." *See* Matrix Reply Br. 5 n.3, 20 (citing *Schenker* and cases standing for similar propositions); *see also* Matrix Br. 13. But in a case decided while briefing in this case was underway, the Second Circuit expressly disavowed *Schenker* and that proposition. *See Dorchester*, *supra*, at *4 ("[T]his Court has never adopted that standard . . . , and we decline to do so now as it is inconsistent with the framework set forth in *Ball* [*v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)]"). In *Dorchester*, the plaintiff had submitted documents which, if credited as authentic, would have sufficed to establish personal jurisdiction. *Id.* In response, defendant submitted sworn declarations and supporting documentation that tended to show that the documents relied on by plaintiff were forgeries. *Id.* The district court concluded that defendant's submission was direct, highly specific, and that it had not been refuted by plaintiff; it therefore dismissed the complaint pursuant to Rule 12(b)(2). *Id.* at *2. The Second Circuit reversed. Although it agreed that there was "plainly reason to question the authenticity" of plaintiff's documents, the Second Circuit held that the district court erred by resolving that factual dispute, "rather than evaluating,

whether [plaintiff] had, through its pleadings and affidavits, made a *prima facie* showing of personal jurisdiction notwithstanding any controverting presentation by [defendant]." *Id.* at *4 (citation omitted).

That logic is controlling here. BMS has alleged that Matrix has substantial business dealings in New York and derives substantial revenue from those activities. In response, Matrix avers facts that, if credited, would suggest that BMS has overstated the extent of Matrix's contacts with New York. But, as *Dorchester* explained, the showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction depends on the procedural posture. *Id.* at *3. At this stage, BMS may survive Matrix's motion by establishing a *prima facie* showing of personal jurisdiction solely by allegations. *Id.* BMS has done so here, by alleging facts sufficient to satisfy the "doing business" standard for general jurisdiction under New York law.[3]

To be sure, the declarations and documentary evidence adduced by Matrix are substantial. Were this litigation to move past this initial stage and were the showing required of BMS with respect to personal jurisdiction thereby to be heightened, Matrix ultimately might be able to refute BMS's jurisdictional allegations. *See id.* at *3. The Court expects that, were this litigation to proceed past the motion to dismiss stage, it would exercise its "considerable procedural leeway," *id.* at *5, in determining how to resolve the factual disputes relevant to this question, including potentially by calling for targeted discovery on the issue of personal

---

[3] Because the "continuous and systematic test" of C.P.L.R. § 301 does not provide for jurisdiction as broad as that of the Due Process Clause, the exercise of jurisdiction over a foreign corporation under § 301 ordinarily comports with due process. *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983); *China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*, 882 F. Supp. 2d 579, 598 (S.D.N.Y. 2012) (Kaplan, J.); *M'Baye v. World Boxing Ass'n*, 429 F. Supp. 2d 652, 656 (S.D.N.Y. 2006) (Chin, J.). This case is no exception.

jurisdiction. The Court has no occasion to decide on such a course now, however, because, for the reasons that follow, considered on the merits, the Amended Complaint fails to state a claim.

## III. Contract Claim

As noted, Matrix also moves to dismiss under Rule 12(b)(6), arguing that the Amended Complaint fails to state a claim for breach of contract. The Court agrees.

### A. Applicable Legal Standard

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere CIC L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Under New York law, which applies here, judgment as a matter of law is appropriate if the contract language is unambiguous." *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003); *accord Compagnie Financiere*, 232 F.3d at 157. "The question of 'whether the language of a contract is clear or ambiguous' is one of law, and therefore must be

11

decided by the court." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (quoting *Compagnie Financiere*, 232 F.3d at 158). "Where the parties dispute the meaning of particular contract clauses, the task of the court 'is to determine whether such clauses are ambiguous when read in the context of the entire agreement.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Co.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)).

Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Trust*, 595 F.3d at 466 (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). In contrast, "[n]o ambiguity exists where the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Law Debenture Trust*, 595 F.3d at 467 (second alteration in original) (quoting *Hunt Ltd. v. Lifschultz Fast Freight*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

### B.     Discussion

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*,

91 F.3d 337, 348 (2d Cir. 1996); *accord Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Here, the only dispute is whether Matrix's sale of generic atazanavir in Venezuela, as alleged by BMS, constitutes a breach of the Agreement.

The Agreement is titled the "Immunity From Suit Agreement." Its recitals provide that BMS is the owner or licensee of certain patents and patent applications filed in the Territory (defined as India and designated countries in sub-Saharan Africa) relating to certain compounds used in the manufacture of HIV/AIDS drugs, and that Matrix wishes to import such compounds into the Territory for the manufacture and sale of such drugs. *See* Agreement at 1. The Agreement expressly sets forth its purpose:

> The purpose of this Agreement shall be to permit [Matrix] to increase access to the Products for the benefit of the people of the Territory specifically for the treatment of HIV/AIDS by enabling [Matrix] to make available Products throughout the Territory with immunity from suit on any ground of Intellectual Property infringement on the terms set forth in this Agreement.

*Id.* § 2.1.[4] Under the Agreement, Matrix pledges to use its reasonable best efforts to make the drugs available throughout the Territory. *Id.* Section 2.1 also clarifies that "this Agreement shall not extend or grant immunity from suit or any other rights or privileges to [Matrix] for any sale or distribution of Product outside the Territory . . . ." *Id.*

Section 3.1 sets forth the scope of BMS's grant of immunity to Matrix. Matrix is granted immunity for the:

> (i) manufacture of Product by [Matrix and its affiliates] in the Territory; (ii) sale or other distribution of Products by [Matrix and its affiliates and agents] within the Territory; and (iii) use of Products obtained from [Matrix and its affiliates and agents] for treating HIV/AIDS in the Territory.

---

[4] The defined term "Products" includes atazanavir. *See* Agreement § 1.8 & App. B. The defined term "Intellectual Property" includes the term "Patents," which in turn encompasses specified patent and patent applications listed in Appendix A to the Agreement. *See id.* §§ 1.4, 1.6. This list includes several patent applications pending in Venezuela. *See id.*, App. A, at 10 (atazanavir); Am. Compl. ¶¶ 5, 29.

13

*Id.* § 3.1(a).  The Agreement provides that, "[f]or the avoidance of doubt, the immunity from suit . . . shall provide to [Matrix] a defense against a suit or other enforcement of the Intellectual Property on any ground of infringement arising from [Matrix's] exercise of the grant." *Id.* § 3.1.

Thus, the Agreement expressly allows Matrix to manufacture and sell generic atazanavir in the Territory without fear of a patent infringement suit by BMS.  *See id.* § 3.1(a).  It also expressly states that this grant of immunity does *not* extend to the sale or distribution of generic atazanavir *outside* the Territory.  *See id.* § 2.1.  The Agreement is therefore clear that Matrix does not enjoy immunity from suit for its sale of generic atazanavir in Venezuela, which is outside the Territory.  However, pivotally here, that the Agreement leaves Matrix amenable to *patent* litigation concerning any sales in Venezuela does not mean that any such sales there by Matrix also are a breach of contract—*i.e.*, a breach of the *immunity from suit* Agreement.  On the contrary:  Although the Agreement provides immunity from suit for sales in the Territory, it nowhere purports to prohibit Matrix from making sales outside the Territory.

BMS argues that § 3.1(d) of the Agreement supplies that prohibition.  *See* BMS Br. 22.  That subsection provides:

> [Matrix and its affiliates] shall not sell, distribute or otherwise transfer Products manufactured hereunder to any third parties it reasonably believes may export the Products outside the Territory where Patents exist.

Agreement § 3.1(d).  BMS argues that because "Matrix's product originates in India, sales that result in the distribution of the product in Venezuela plainly involve export of the product outside the Territory."  BMS Br. 22.

But BMS's argument selectively reads § 3.1(d).  BMS overlooks the phrase in the Agreement "*to any third parties* [Matrix] reasonably believes may export the Products outside the Territory."  Agreement § 3.1(d) (emphasis added).  That phrase makes Matrix's presence in

14

the Territory beside the point. Under § 3.1(d), the entity that must be present in the Territory, and therefore in position to *export* the product "outside the territory," is the third party to whom Matrix distributed or sold the product. Here, as alleged, that entity is the Pan American Health Organization. But BMS's Amended Complaint does not anywhere allege that PAHO was located in the Territory and thereafter exported the products outside the Territory. (And PAHO's very name is in tension with the premise that it was located in India or sub-Saharan Africa.)

BMS's interpretation, by focusing on *Matrix*'s presence in the Territory, would wrongly conflate Matrix with the third party whose export is a required condition for § 3.1(d) to apply. And it would transform § 3.1(d) into a provision creating a broad contractual duty not to sell a covered Product in any country outside the Territory where the defined Patents exist. But that is not what the text of § 3.1(d) provides. And the context of § 3.1(d) makes that clear. Section 3.1(d) is a subsection of the provision defining the scope of the immunity grant. Its reference to "Products manufactured *hereunder*"—*i.e.*, under the contractual grant of immunity—underscores that § 3.1(d) is concerned with preventing Matrix from expanding the scope of the immunity granted by selling generic atazanavir indirectly through third parties in the covered Territory. In other words, § 3.1(d) provides that Matrix cannot claim immunity under the Agreement were it, for example, to use a third-party intermediary in India to enable it to sell generic atazanavir in Pakistan. Section 3.1(d) does not, however, prevent Matrix itself from selling generic atazanavir in Pakistan, or, relevant here, Venezuela.

To be sure, Matrix's sales of generic atazanavir may be actionable on other grounds. BMS may have a cause of action against Matrix for its sales in Venezuela under relevant patent

15

or other laws. But BMS's claim here is for breach of contract, based on the Agreement. Under the plain language of the Agreement, no such claim lies.[5]

BMS also argues that the parties' conflicting interpretations of the Agreement create a genuine issue of material fact that cannot be resolved on this motion. *See* BMS Br. 23. But "[t]he mere assertion of an ambiguity does not suffice to make an issue of fact." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)). "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers*, 7 F.3d at 1095. "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *Law Debenture Trust*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)). Here, BMS's interpretation is contrary to the Agreement's plain language. It would transform the immunity of suit agreement, expressly intended to facilitate the provision of HIV/AIDS drugs to populations in need, *see* Agreement § 2.1, to a farther-reaching prohibition on sales by Matrix outside the affected Territories. The Agreement does not so state, however, and any remedy by BMS for such sales must derive from sources other than the Agreement, *e.g.*, applicable patent

---

[5] In a separate argument for dismissal, Matrix argues that Venezuela is not a country "where Patents exist," and therefore that § 3.1(d) does not apply for that additional reason. In making this claim, Matrix notes that Venezuela has a policy prohibiting patents on pharmaceutical products, and that one of Matrix's patent applications there has been denied. *See* Matrix Br. 24; Matrix Reply Br. 23. But that argument is defeated by language elsewhere in the Agreement. Whatever the likelihood that BMS's remaining patent applications will be approved, the parties to the Agreement specifically agreed that the term "Patents" includes not only approved patents, but also the patent applications at issue here. *See* Agreement § 1.6 & App. A.

laws, if any. Because the Agreement is not ambiguous, and because BMS has not alleged a breach of its terms, dismissal now is warranted.[6]

## CONCLUSION

For the foregoing reasons, Matrix's motion to dismiss pursuant to Rule 12(b)(6) is granted. BMS's motion for jurisdictional discovery is denied as moot. The Clerk of Court is directed to terminate the motions pending at docket numbers 10, 18, and 23, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: August 12, 2013
       New York, New York

---

[6] BMS represents that Matrix sought BMS's permission to sell generic atazanavir in Venezuela, and that, after BMS asked Matrix to stop shipping this product to Venezuela, Matrix attempted to comply, suggesting an admission of liability by Matrix. *See* BMS Br. 23 (citing Am. Compl. ¶¶ 5, 10–11). But those events, even assuming that they occurred as BMS represents, have no bearing on the meaning of the Agreement. And Matrix's forbearance in the face of BMS's demand does not inherently say anything about the Agreement. Matrix may have concluded that its shipments were otherwise prohibited; that the cost and risks of litigation counseled in favor of backing down; and/or that maintaining good relations with business partner BMS was top priority. *See W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law.").

17