```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/13/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
BRISTOL-MYERS SQUIBB COMPANY,                               :
                                                            :           12 Civ. 5846 (PAE)
                                    Plaintiff,              :
                                                            :           OPINION & ORDER
                -v-                                         :
                                                            :
MATRIX LABORATORIES LIMITED, *now known as*                 :
*Mylan Laboratories Limited*,                               :
                                                            :
                                    Defendant.              :
                                                            :
------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      In this case, now on remand from the Second Circuit, plaintiff Bristol-Myers Squibb Company ("BMS") brings breach of contract claims against defendant Matrix Laboratories Limited ("MLL"). MLL moves to dismiss the Second Amended Complaint ("SAC") under Federal Rule of Civil Procedure 12(b)(6), arguing that the SAC fails to state a claim.

      The motion turns on a discrete provision in the parties' agreement. In relevant part, the agreement prohibited MLL from selling certain prescription drugs to "third parties it reasonably believe[d] may export the [drugs] outside" of a specified territory (India and parts of sub-Saharan Africa). MLL concedes that it sold covered drugs to a third party for distribution outside of that territory. The disputed issue is whether that third party, as opposed to MLL or a common carrier, "exported" the drugs from inside to outside the territory. For the following reasons, the Court holds that the SAC does not adequately so allege. Accordingly, the Court finds that the SAC fails to state a claim and grants MLL's motion to dismiss.

## I.    Background

The Court assumes familiarity with its August 12, 2013 decision, Dkt. 30, *reported at Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 964 F. Supp. 2d 287 (S.D.N.Y. 2013), and the Second Circuit's October 7, 2014 decision, *reported at Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 586 F. App'x 747 (2d Cir. 2014) (summary order). The facts and procedural history relevant to the motion now pending before the Court are summarized below.

### A.    Factual Background[1]

BMS is a Delaware corporation with its principal place of business in New York. SAC ¶ 20. It sells the well-known HIV/AIDS drug atazanavir under the brand name Reyataz. *Id.* ¶ 1. It has patents or pending patent applications related to atazanavir in more than 50 countries. *Id.* ¶ 1 n.1. MLL is an Indian corporation with its principal place of business in India. *Id.* ¶ 21. It is in the business of manufacturing, marketing, and selling generic pharmaceutical products throughout the world, including in the United States. *Id.*

---

[1] The Court's account of the underlying facts of this case is drawn primarily from the Second Amended Complaint. Dkt. 39 ("SAC"). In resolving the motion to dismiss, the Court assumes all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

To resolve defendant's motion, the Court also considered two sets of documents: First, the Court considered the invoices and purchase orders attached as exhibits to the SAC. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (At the motion to dismiss stage, the Court "may consider 'any written instrument attached to [the Complaint] as an exhibit.'" (quoting *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)) (alteration in original)). Second, the Court considered the bid solicitation, quotation, and notice documents that defendants produced to the Court on March 24, 2015. *See* Dkt. 69. These documents were not attached to the SAC or incorporated by reference therein; however, plaintiff's counsel consented to their use for the purpose of resolving the motion to dismiss. Dkt. 70, at 3. Although these documents reinforced the conclusion that the SAC fails to state a claim, the Court would have reached the same outcome based on the SAC alone.

2

On April 17, 2011, BMS and MLL entered into an "immunity from suit" agreement. *Id.* ¶ 2; *see also id.* Ex. 1 (the "Agreement"). Under the Agreement, patent holder BMS gave MLL the right to manufacture, distribute, and sell generic atazanavir in certain underdeveloped countries without fear of patent litigation by BMS. *Id.* ¶¶ 2, 30. BMS also agreed to forego any royalties or profits associated with MLL's sale of generic atazanavir and to give MLL the "proprietary know-how" necessary to enable it to produce the drug on its own. *Id.* ¶¶ 2–3. The Agreement's purpose was to facilitate broad, low-cost distribution of generic atazanavir to areas in dire need of HIV/AIDS treatment and prevention. *Id.* ¶ 2.

The Agreement immunized from patent litigation MLL's sale of generic atazanavir only in the specified "Territory," which was defined to include India and 44 countries in sub-Saharan Africa. *See* Agreement § 1.10 & App'x C. Accordingly, under the Agreement, BMS retained its existing rights to sue MLL for patent infringement if MLL sold atazanavir outside the Territory in countries where BMS has patents or pending patent applications. *Id.* § 3.1(a). The Agreement also provided in its § 3.1(d)—the provision at issue here—that MLL "shall not sell, distribute, or otherwise transfer Products manufactured hereunder to any third parties it reasonably believes may export the Products outside the Territory where Patents exist."

The issue in this case involves sales of atazanavir in Venezuela, which falls outside the Territory as defined in the Agreement. *See* Agreement App'x C; SAC ¶¶ 4, 31. In November 2011, MLL asked BMS to consent to MLL's selling generic atazanavir there. SAC ¶¶ 6, 33. BMS did not consent because, at the time of MLL's request, it had supplied Reyataz, its brand-name atazanavir, to Venezuela for several years; it anticipated selling Reyataz to Venezuela in 2012; and it had two patent applications related to atazanavir pending in Venezuela. *Id.* ¶¶ 6, 31,

3

34; Agreement App'x A. Twice more in early 2012, MLL sought a "special waiver" to engage in such sales; BMS again declined to consent. SAC ¶¶ 7–9.

Nevertheless, in February 2012, BMS alleges, MLL sold a significant amount (an estimated six-month supply for Venezuela) of atazanavir to the Pan American Health Organization ("PAHO"), knowing that PAHO would then distribute this atazanavir in Venezuela. *Id.* ¶¶ 10–11, 36. The atazanavir was later shipped to the Venezuelan Ministry of Health and distribute throughout Venezuela. *Id.* ¶¶ 11–12, 36–37.

On March 1, 2012, after BMS learned about MLL's sale to PAHO, BMS contacted the general counsel of Mylan, MLL's "ultimate parent, requesting that Mylan take immediate steps to retrieve the atazanavir that was shipped to Venezuela." *Id.* ¶ 13. Although the general counsel responded that Mylan would attempt to prevent the distribution of the atazanavir, MLL "took no further steps to claw back the generic atazanavir" that it had sold to PAHO. *Id.* ¶ 14. To the contrary, BMS alleges, in 2014, MLL sold another 50,000 units of atazanavir, estimated as a five-month supply for Venezuela, to PAHO and shipped the units to the Venezuelan Ministry of Health. *Id.* ¶¶ 15, 42–43. As of November 25, 2014, BMS believed that MLL was continuing to sell atazanavir to PAHO for distribution in Venezuela. *Id.* ¶ 17.

### B. The Court's August 12, 2013 Opinion

On July 30, 2012, BMS filed an original Complaint, Dkt. 1, and on April 16, 2013, a First Amended Complaint, Dkt. 17 ("FAC"). The FAC brought a single claim, for breach of contract.

The FAC's theory of liability was that any sales by MLL that resulted in the distribution of atazanavir in Venezuela would themselves breach the Agreement. The FAC alleged that MLL "sold a significant amount of atazanavir to [PAHO] and shipped said atazanavir to the Venezuelan Ministry of Health." FAC ¶ 9. This breached the Agreement, according to the FAC,

4

because the Agreement "expressly prohibit[ed] [MLL] from selling or distributing atazanavir, either directly or indirectly, into countries where BMS maintains a patent or, as here, where it has a patent pending." *Id.* ¶ 13. Thus, MLL's sale violated § 3.1(d) of the Agreement because MLL "knew that the purpose of this sale was to allow PAHO to distribute atazanavir in Venezuela," *id.* ¶ 9, and atazanavir was, in fact, sold in Venezuela. *Id.* ¶¶ 12, 33, 35.

On May 15, 2013, MLL moved to dismiss. Dkt. 18. In that motion, MLL argued that (1) the Court lacked personal jurisdiction, and (2) the FAC failed to state a claim for breach of contract.

On August 12, 2013, after briefing, the Court granted MLL's motion, finding that the FAC failed to state a claim. Dkt. 30.[2] The Court held that BMS read the Agreement too broadly by construing it to affirmatively prohibit MLL from bringing about sales of atazanavir outside the Territory. *Id.* at 12–16. The Agreement, in giving MLL immunity from suit for sales within the Territory, left in place BMS's right to bring *patent infringement* lawsuits against MLL for sales it makes outside the covered Territory. But, the Court held, the Agreement did not itself contain a freestanding prohibition on sales of atazanavir by MLL outside the Territory, so as to give rise to a breach of contract claim when such sales occur. *Id.* at 15–16.

Rather, the Court held, the Agreement imposed a prohibition on sales outside the Territory only in the context of sales by MLL "'to any third parties [MLL] reasonably believes may export the Products outside the Territory where Patents exist.'" *Id.* at 14 (quoting Agreement § 3.1(d)). And, the Court found, the FAC did not make any such allegation. The FAC, the Court noted, "[did] not anywhere allege that PAHO was located in the Territory and

---

[2] The Court found that BMS had made a sufficient *prima facie* showing of personal jurisdiction. *Id.* at 5–10.

thereafter exported the products outside the Territory." *Id.* at 15. The Court therefore held that, although BMS was free to pursue other claims (*e.g.*, for patent infringement) against MLL for the sales in Venezuela, the FAC did not state a claim for breach of the Agreement. *Id.* at 15–16.

### C.     The Second Circuit's October 7, 2014 Decision

BMS appealed. Dkt. 32. On October 7, 2014, after briefing and argument, the Second Circuit issued its decision. *See Bristol-Myers Squibb Co.*, 586 F. App'x 747.

The Second Circuit agreed with this Court that § 3.1(d) was the only part of the Agreement that could give rise to liability for breach of contract based on sales outside the Territory, and that the FAC, as pled, did not allege a breach of § 3.1(d). *See id.* at 750–51. The Circuit noted that, under § 3.1(d), MLL could not be in breach for its *own* export of atazanavir from the Territory to an entity in a place outside the Territory—the theory of liability articulated in the FAC. *See id.* at 750. Rather, to constitute a breach, the export of atazanavir from the Territory to a place outside it had to have been done by the third-party buyer. *Id.* at 750–51 & n.1. Here, the Circuit noted, the FAC had not alleged that PAHO, the third party who had allegedly distributed the drug in Venezuela, had been located in the Territory. *Id.* at 751. Instead, the FAC alleged, PAHO was located in Venezuela. Thus, on the facts alleged, the Circuit held, the FAC did not adequately allege a breach of § 3.1(d). *See id.* at 750–51.

The Second Circuit, however, remanded, to give BMS the opportunity to replead, based on a construction of § 3.1(d) that BMS first articulated on appeal. *Id.* at 751–52. BMS argued that the word "export," as used in § 3.1(d), is ambiguous, and that under some meanings of "export," an entity situated outside the Territory might nonetheless qualify as an "exporter" of the atazanavir from the Territory to a place outside it. *Id.* at 750. And so, conceivably, PAHO, despite being situated outside the Territory, might have "export[ed]" the atazanavir from within

the Territory to Venezuela. *See id.*[3] The Circuit accepted this argument. It therefore held that the word "export" in § 3.1(d) prohibited both "transfers [by MLL] of atazanavir to third parties that are 'present in the Territory'"—the scenario this Court had addressed in its August 12, 2013 Opinion—and also "transfers to third parties located anywhere when the transferee takes title to the products while those *products* are present in the Territory" where MLL reasonably believes the third party will then export these products outside. *Id.*

The Circuit recognized, however, that the FAC's allegations were "not sufficient to support the inference that PAHO . . . took title to the atazanavir in the Territory." *Id.* at 751. Therefore, the FAC "fail[ed] to state a claim under either permissible interpretation of the [Agreement]": The FAC had pled neither that PAHO was present in the Territory at the time the atazanavir was transferred to it, nor that PAHO, although physically outside the Territory, had taken title to the drugs while they were in the Territory and exported them to a place outside it. *Id.* The Circuit remanded "so [that] BMS can seek leave to amend its complaint" consistent with the latter theory of export liability. *Id.* at 752.

Significantly, in so holding, the Second Circuit emphasized the narrowness of this theory of liability. The Circuit rejected BMS's claim that § 3.1(d) would be breached by a transfer that MLL "reasonably believes will *result* in the Product being exported outside the Territory." *Id.* at 751 (emphasis in original). Rather, the Circuit emphasized, the Agreement "unambiguously cover[ed] only those situations in which the 'third party' is performing the exportation." *Id.* Accordingly, the panel agreed with MLL and this Court that, for a third party to "export"

---

[3] In considering this new theory of liability, the Circuit recognized the "general rule that an appellate court will not consider an issue raised for the first time on appeal," but exercised its discretion to entertain BMS's new theory because BMS had presented a "'pure question of law' that [did] not require additional factual development." *Id.* (citation omitted).

7

atazanavir outside the Territory, the third party—not MLL or a common carrier—"must move the product *from* the Territory *to* some other location." *Id.* at 750–51 & n.1.

### D. Remand to this Court

On November 25, 2014, with this Court's authorization, BMS filed the SAC. Dkt. 39. The SAC contains two contract-breach claims, corresponding to separate atazanavir sales in 2012 and 2014. As to each, the SAC pursues the theory of liability recognized as viable by the Second Circuit, to wit, that MLL breached § 3.1(d) of the Agreement by selling atazanavir to a third party, PAHO, that was situated outside the Territory but took title to the atazanavir in the Territory, and that MLL "reasonably believ[ed] that PAHO may export the Products outside the Territory." *Id.* ¶¶ 16, 18, 37–38, 42–43. The SAC alleges that PAHO's ensuing distribution within Venezuela caused BMS to lose approximately one year's worth of sales of atazanavir in Venezuela, with estimated damages of more than $30 million. *Id.* ¶¶ 19, 40, 44.

On January 9, 2015, MLL filed a motion to dismiss, Dkt. 42, along with a memorandum of law, Dkt. 43 ("MLL Br."), and a declaration, Dkt. 44. As before, MLL moved to dismiss for both lack of personal jurisdiction and failure to state a claim. However, in the course of briefing, MLL abandoned the personal jurisdiction claim.[4] On February 20, 2015, BMS submitted its opposition to the motion to dismiss. Dkt. 61 ("BMS Br."), 62. On March 23, 2015, MLL submitted its reply. Dkt. 65 ("MLL Reply Br."), 66.

Also on March 23, 2015, the Court issued an order requesting any "contract or other written terms pursuant to which the atazanavir was transferred from [MLL] to PAHO in 2012

---

[4] During briefing, BMS cross-moved to transfer venue to District of New Jersey, and the parties briefed both that motion and MLL's motion to dismiss for lack of personal jurisdiction. Dkt. 60–62, 65–66. Later, however, MLL filed a letter stating that (1) MLL consented to personal jurisdiction for this action, and was therefore dropping its motion to dismiss based on lack of personal jurisdiction, and (2) BMS's motion to transfer venue was, therefore, moot. Dkt. 67.

and/or 2014." Dkt. 68. On March 24, 2014, the parties submitted a joint letter attaching various documents that, they agree, comprise the written agreements between MLL and PAHO. Dkt. 69 ("Joint Letter"). On March 25, 2015, the Court heard argument. Dkt. 70 ("Tr.").

## II.     Legal Standards

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible"—not merely "conceivable"—"on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 683 (2009) (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted).

## III.    Discussion

Section 3.1(d) of the BMS/MLL Agreement provided that MLL "shall not sell, distribute, or otherwise transfer Products manufactured hereunder to any third parties it reasonably believes may export the Products outside the Territory where Patents exist." The issue here is whether BMS has adequately pled that PAHO "export[ed] the Products outside the Territory."

The Second Circuit's decision leaves open, in theory, two routes by which a third-party buyer such as PAHO could qualify as an exporter of "the product *from* the Territory *to* some other location" within the meaning of the Agreement. *Bristol-Myers Squibb Co.*, 586 F. App'x at 750. First, such a buyer could be "present in the Territory" and cause the goods to move

9

outside the Territory; second, the buyer could "take title to the products while those products [were] present in the territory" and cause the product to move outside the Territory. *Id.* The Second Circuit's decision (and this Court's earlier decision) regarding the FAC, however, preclude the first theory: Both held that the FAC did not allege that PAHO was present in the Territory, and, on remand, BMS does not fortify (or even pursue) that theory.

Accordingly, under the Second Circuit's decision, there is only one narrow avenue open for BMS to state a claim of a breach of § 3.1(d): by alleging that title to the atazanavir transferred from MLL to PAHO while the drugs were in India. *Id.* at 750–52. The SAC primarily seeks to state a claim under this theory. *See* SAC ¶¶ 10–12, 16, 37–38, 42–43. BMS, however, separately attempts to plead that PAHO was an exporter on a different factual theory: that "PAHO controlled the decision of where the product would be sent," SAC ¶ 12, and by doing so "exported the product to the Venezuela Ministry of Health using a common carrier," *id.* ¶ 37. The Court analyzes these two theories in turn.

### A. BMS Has Not Adequately Alleged that Title Transferred in India

The parties now agree, and the contract documents cognizable on this motion to dismiss confirm, that the contract between MLL and PAHO was governed by the Incoterms. *See* SAC ¶ 10 & n.4; MLL Br. 6, 22; Tr. 26.[5] The Incoterms are "standardized shipping term[s]" created by the International Chamber of Commerce that "apportion[] the costs and liabilities of international shipping between buyers and sellers." Black's Law Dictionary (10th ed. 2014), at 884. The SAC further pleads that PAHO purchased the atazanavir on a "carriage and insurance

---

[5] The written agreement for each transaction between MLL and PAHO consisted of a "purchase order, together with the solicitation, the Notification, and the bid." Joint Letter, Ex. 1, at 7; *see also id.* Ex. 5, at 8. The bid solicitation documents expressly incorporated the Incoterms. *See id.* Ex. 1, at 6; *id.* Ex. 5, at 6. And the purchase orders referred to "CIP" delivery, a term of art unique to the Incoterms. *See* SAC Exs. 2–3; Tr. 10–11.

10

paid" ("CIP") basis, SAC ¶ 10, Exs. 2–3 (purchase orders and invoices stating that the terms of delivery were "CIP"). Pursuant to the Incoterms governing CIP contracts, the risk of loss transfers from the seller to the buyer when the seller delivers the goods to the common carrier. Incoterms 2010: ICC Rules for the Use of Domestic and International Trade Items (2010) [hereinafter "Incoterms"], at 48–49 (Rules A4 and B4 for CIP contracts). Therefore, BMS notes, the risk of loss transferred from MLL to PAHO when MLL delivered the atazanavir to the airfreight carrier in India, for transport to Venezuela. *See* SAC ¶ 16.

BMS's suggestion that title transfer follows the risk of loss under the Incoterms is, however, not correct. The Incoterms do not address "the transfer of ownership of the goods" because such "matters are normally dealt with through express terms in the contract of sale or in the law governing the contract." Incoterms at 6; *see also Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2009 WL 89115, at *10 (S.D.N.Y. Jan. 14, 2009) ("[T]he Incoterms define terms of delivery and address the passage of risk, but do not govern the passage of title."); *St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support*, No. 00 Civ. 9344 (SHS), 2002 WL 465312, at *4 (S.D.N.Y. Mar. 26, 2002), *aff'd*, 53 F. App'x 173 (2d Cir. 2002) (summary order) ("Incoterms, however, only address passage of risk, not transfer of title.").

Indeed, tellingly, in the SAC, BMS relied heavily on the Uniform Commercial Code ("UCC"), which provides that "title passes to the buyer at the time and place of shipment." *See* SAC ¶ 11 (citing UCC § 2-401). But the UCC applies only where: (a) the parties agree that the UCC applies, and the transaction "bears a reasonable relation" to a UCC jurisdiction, or (b) the contract is silent as to whether the UCC applies, but the transaction "bear[s] an appropriate relation" to a UCC jurisdiction. N.Y. U.C.C. § 1-301; *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000); *Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir. 1994).

The transactions between MLL and PAHO—namely, the sale of drugs manufactured in India for distribution in Venezuela—bore no relation to a UCC jurisdiction. Accordingly, as BMS conceded at argument, the UCC does not apply to those transactions. *See* Tr. 26–27. The SAC's citations to the UCC therefore do not plead a title transfer to PAHO within the Territory.

In an argument made in its memorandum of law, although not in the SAC, BMS cites the law of India as a different basis for asserting that title transferred to PAHO within India. BMS argues there that the law of India "likely yields the same result" as the UCC. BMS Br. 13–14. But BMS's statement in its brief about the law of India is mere speculation that cannot sustain the SAC. *See Twombly*, 550 U.S. at 555.

And, in fact, the law of India does *not* support the theory that title to the atazanavir transferred from MLL to PAHO in India. The Indian Sale of Goods Act of 1930 provides that "property in [goods] is transferred to the buyer at such time as the parties to the contract intend it to be transferred." Ch. III, § 19(1). "Unless a different intention appears," a series of default rules govern "the time at which the property in the goods is to pass to the buyer." *Id.* § 19(3). Where "goods are delivered to the buyer on approval or 'on sale or return' or other similar terms, the property therein passes to the buyer (a) when he signifies his approval or acceptance to the seller" or (b) upon the expiration of a "fixed" or "reasonable" amount of time afforded for the buyer to "signify his approval or acceptance to the seller" or "giv[e] notice of rejection." *Id.* § 24. Here, the written agreement between MLL and PAHO gave PAHO 90 days to inspect the shipments of atazanavir and reject any nonconforming goods. Joint Letter, Ex. 1, at 18; *id.* Ex. 5, at 16. It follows that title transferred either (a) when PAHO informed MLL that it accepted the goods, or (b) when the 90-day inspection period expired, assuming PAHO had not rejected the

goods by that time. Under either scenario, title transferred *after* the atazanavir was exported from India and delivered to Venezuela.

The SAC does not supply any other basis on which the Court could infer that title to the atazanavir transferred from MLL to PAHO in India. The allegations in the SAC do not take that assertion "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### B. BMS Has Not Adequately Alleged that PAHO Was an Exporter

Under the Second Circuit's decision, for BMS to state a claim, it must adequately plead that PAHO "exported" the atazanavir, *i.e.*, that PAHO "move[d] the product *from* the Territory *to* some other location." *Bristol-Myers Squibb Co.*, 586 F. App'x at 750; *see also* Black's Law Dictionary (10th ed. 2014), at 700 (defining "export" as "[t]o send or carry abroad"; "[t]o send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"). This construction follows from Second Circuit law addressing the concept of exporting. Exporting "necessarily entails some degree of possession." *Kuhali v. Reno*, 266 F.3d 93, 104–05 (2d Cir. 2001). Possession can be "actual" in "the everyday sense of tangible, physical dominion or control over an object," or it can be "constructive" in the "sense of the power to exercise dominion and control." *Id.* at 105. For this reason, the Second Circuit held, BMS was required to plead either that PAHO was present in the Territory (*i.e.*, it had actual control over the atazanavir) or that it took title to the products while they were present in the Territory (*i.e.*, it had constructive control over the atazanavir). For the reasons addressed above, the SAC does not adequately plead "either permissible interpretation of the [Agreement]." *See Bristol-Myers Squibb Co.*, 586 F. App'x at 750.

In the SAC, however, BMS attempts to chart a third course, not invited by the Second Circuit's decision: The SAC alleges that PAHO was an "exporter" because it "controlled the

decision of where the product would be sent." *Id.* ¶ 12; *see also id.* ¶¶ 16, 37. In other words, unable to allege that PAHO itself sent, took, carried, or otherwise moved the atazanavir out of India, BMS urges the Court to expand the definition of "exporter" to include any party that directs or requests such transportation.

For several independent reasons, this construction fails. First, it distorts the ordinary meaning of the term "export." *Canton R. Co. v. Rogan*, 340 U.S. 511, 514–15 (1951) (a party's "handling of goods, which are destined for export" does not make the party an "exporter"). Second and related, it would lead to absurd results: Under BMS's argument, any ordinary consumer who orders a product from another country—say, a bottle of wine from France or a pair of shoes from Italy—would automatically become an exporter. Third, it is inconsistent with the Second Circuit's decision, which rejected BMS's argument that § 3.1(d) prohibits any transfers MLL "reasonably believes will *result* in the Product being exported outside the Territory." *Bristol-Myers Squibb Co.*, 586 F. App'x at 750 (emphasis in original). Fourth, it is inconsistent with the structure of BMS and MLL's contract: The Agreement anticipated that BMS would predominantly protect its interests as to atazanavir through patent litigation, not through suits for breach of the Agreement. BMS did not, after all, immunize MLL from patent suits except in the limited contexts authorized under the Agreement, and § 3.1(d), the only relevant contractual prohibition, as the Second Circuit recognized, applies only in narrow circumstances. However, under BMS's definition of "export," § 3.1(d) would serve as a broad prohibition on selling atazanavir anywhere outside of the Territory such that sales anywhere else in the world could give rise to a claim of contract breach. For these reasons, although the term "export" is subject to some ambiguity, *see Bristol-Myers Squibb Co.*, 586 F. App'x at 750, BMS's new and broad construction of that term is not viable.

Moreover, apart from the allegations about PAHO's control over the atazanavir, the SAC contains only conclusory allegations regarding PAHO's ostensible role as an "exporter." *See* SAC ¶ 11 ("After taking title to and/or control of the atazanavir, PAHO exported the product from India to Venezuela . . ."); *id.* ¶ 37 ("PAHO exported the product to the Venezuela Ministry of Health using a common carrier."). Although the Court generally "must accept as true all of the allegations contained in a complaint," that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals" that are "supported by mere conclusory statements do not suffice." *Id.*; *see also Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 224–25 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014). Accordingly, the SAC's repeated statements that PAHO "exported" the atazanavir—an assertion unsupported by concrete factual allegations—does not suffice to state a claim.

Furthermore, the written agreement between MLL and PAHO, which the parties agree is cognizable on this motion, unambiguously assigns responsibility for the export process to MLL, not PAHO. Concretely, MLL was obligated to: (1) procure a shipping contract with a common carrier to deliver the atazanavir to Venezuela, Incoterms, at 46 (CIP Rule A3); Joint Letter, Ex. 1, at 15–16, Ex. 5, at 13–14;[6] (2) pay the cost of that shipping, *id.*; (3) obtain insurance to cover against PAHO's risk of loss or damage to the drugs until they reached Venezuela, *id.*; (4) pay for that insurance, *id.*; (5) "obtain, at [MLL's] own risk and expense, any export license or other official authorization and carry out all customs formalities necessary for the export of the goods and for their transport through any country prior to delivery," *id.* at 44 (CIP Rule A2); (6) pay

---

[6] Consistent with the agreement between MLL and PAHO, the SAC alleges that "PAHO placed an order for, and [MLL] agreed to ship, 50,000 units of atazanavir to the Venezuelan Ministry of Health." SAC ¶ 15.

15

"the costs of customs formalities necessary for export, as well as all duties, taxes, and other charges payable upon export," *id.* at 48 (CIP Rule A6); (7) "reimburse [PAHO] for all costs and charges" it incurred in providing MLL with "any documents and information, including security-related information, that [MLL] need[ed] for the transport and export of the goods and for their transport through any country," *id.* at 50–51 (CIP Rules A10 and B10); and (8) bear the "costs and expenses resulting directly or indirectly from third party delays," Joint Letter, Ex. 1, at 8, Ex. 5, at 8.[7]

As pled, these acts were all performed by MLL, not PAHO. The parties have not identified, and the Court cannot conceive of, any other acts that an exporter would perform. Without any pleading of a concrete role for PAHO in "mov[ing] the product *from* the Territory *to* some other location," the Court cannot infer that PAHO exported the atazanavir. The pleadings would permit the finding that MLL was an exporter, and perhaps the common carrier as well, insofar as the common carrier physically moved the drugs from India to Venezuela. But as the Second Circuit has squarely held, for MLL to have breached § 3.1(d) of the Agreement, the third party, PAHO—not MLL or the common carrier—must have exported the atazanavir. *Id.* at 750–51 & n.1. BMS's SAC therefore does not state a claim for breach of contract.

---

[7] The invoices MLL issued to PAHO list MLL as the "exporter," *see* SAC Exs. 2–3, a point that MLL emphasized at argument. In ruling for MLL, however, the Court does not rely on that designation. There is no indication that that word choice on the invoices reflects a negotiated contract term under which MLL and PAHO designated MLL as the exporter. Further, at the motion to dismiss stage, the Court cannot find that PAHO's receipt of such invoices reflected its acquiescence to the "exporter" designation. The invoices appear to be form documents. Without the benefit of discovery, the significance, if any, to the "exporter" designation on them is elusive.

## CONCLUSION

For the foregoing reasons, MLL's motion to dismiss pursuant to Rule 12(b)(6) is granted.

The Clerk of Court is directed to terminate all pending motions, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: May 13, 2015
      New York, New York