UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

BRISTOL-MYERS SQUIBB COMPANY,

                              Plaintiff,

                -v-

MATRIX LABORATORIES LIMITED, *now known as*
*Mylan Laboratories Limited*,

                         Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/20/15

12 Civ. 5846 (PAE)

OPINION & ORDER

**PAUL A. ENGELMAYER, District Judge:**

On May 13, 2015, the Court dismissed plaintiff Bristol Myers-Squibb Company's ("BMS") Second Amended Complaint ("SAC"), which asserted two breach of contract claims against defendant Matrix Laboratories Limited ("MLL"). On June 3, 2015, BMS filed a motion for reconsideration. For the following reasons, that motion is denied.

## I.    Background

The Court assumes familiarity with the facts of this case and with the Court's May 13 Opinion and Order. *See* Dkt. 74 ("May 13 Opinion"), *reported at Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, No. 12 Civ. 5846 (PAE), 2015 WL 2257705 (S.D.N.Y. May 13, 2015). The facts and procedural history relevant to the instant motion are briefly summarized below.

### A.    Factual Background

On April 17, 2011, BMS and MLL entered into an "immunity from suit" agreement. SAC ¶ 2; *see also id.* Ex. 1 (the "Agreement"). Under the Agreement, BMS gave MLL the right to manufacture, distribute, and sell the HIV/AIDS drug atazanavir in certain underdeveloped countries without fear of litigation by BMS, which has patents or pending patent applications

related to atazanavir in more than 50 countries. *Id.* ¶¶ 1 n.1, 2, 30. The Agreement immunized MLL's sale of generic atazanavir only in the specified "Territory," which was defined to include India and 44 countries in sub-Saharan Africa. *See* Agreement § 1.10 & App'x C. Accordingly, BMS retained its existing rights to sue MLL for patent infringement if MLL sold atazanavir outside the Territory. Agreement § 3.1(a). The Agreement also provided in § 3.1(d)—the provision at issue here—that MLL "shall not sell, distribute, or otherwise transfer Products manufactured hereunder to any third parties it reasonably believes may export the Products outside the Territory where Patents exist."

This case involves sales of atazanavir in Venezuela, which falls outside the Territory as defined in the Agreement. *See* Agreement App'x C; SAC ¶¶ 4, 31. BMS alleges that in 2012 and 2014, MLL sold a significant amount of atazanavir to the Pan American Health Organization ("PAHO"), knowing that PAHO would then distribute the drugs in Venezuela. *Id.* ¶¶ 10–11, 36, 15, 42–43. The atazanavir was later shipped to the Venezuelan Ministry of Health and distributed throughout Venezuela. *Id.* ¶¶ 11–12, 36–37.

### B. Procedural History

On July 30, 2012, BMS filed its original Complaint, Dkt. 1, and on April 16, 2013, the First Amended Complaint, Dkt. 17 ("FAC"). The FAC's theory of liability was that any sales by MLL that resulted in the distribution of atazanavir in Venezuela would themselves breach the Agreement. According to the FAC, the Agreement "expressly prohibit[ed] [MLL] from selling or distributing atazanavir, either directly or indirectly, into countries where BMS maintains a patent or, as here, where it has a patent pending." FAC ¶ 13.

On May 15, 2013, MLL moved to dismiss. Dkt. 18. On August 12, 2013, after briefing, the Court granted MLL's motion, finding that the FAC failed to state a claim. Dkt. 30. The

Court held that BMS read the Agreement too broadly by construing it to affirmatively prohibit MLL from bringing about sales of atazanavir outside the Territory. *Id.* at 12–16. Although preserving BMS's right to bring patent infringement lawsuits against MLL for sales of atazanavir outside the covered Territory, the Court held that the Agreement did not contain a freestanding prohibition on such sales, so as to give rise to a breach of contract claim whenever such sales occur. *Id.* at 15–16. Rather, the Agreement imposed a prohibition on sales outside the Territory only in the context of sales by MLL "to any third parties [MLL] reasonably believes may export the Products outside the Territory where Patents exist." *Id.* at 14 (quoting Agreement § 3.1(d)). And the FAC, the Court noted, "[did] not anywhere allege that PAHO was located in the Territory and thereafter exported the products outside the Territory." *Id.* at 15.

BMS appealed. Dkt. 32. On October 7, 2014, after briefing and argument, the Second Circuit issued its decision. *See Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 586 F. App'x 747 (2d Cir. 2014) (summary order). The Second Circuit agreed with this Court that § 3.1(d) was the only part of the Agreement that could give rise to liability for breach of contract based on sales outside the Territory, and that the FAC, as pled, did not allege a breach of § 3.1(d). *See id.* at 750–51. The Circuit further agreed with this Court that, under § 3.1(d), MLL could not be in breach for its *own* export of atazanavir from the Territory to an entity in a place outside the Territory—the theory of liability articulated in the FAC. *See id.* at 750. Rather, the Circuit held, the Agreement "unambiguously cover[ed] only those situations in which the 'third party' is performing the exportation" by "mov[ing] the product *from* the Territory *to* some other location." *Id.* at 750–51 & n.1.

On appeal, however, BMS had articulated a new theory of liability, one not included in the FAC. BMS argued there that the word "export" as used in § 3.1(d) is ambiguous, and that

under some meanings of that term, PAHO, despite being situated outside the Territory, might nonetheless qualify as an "exporter" of the atazanavir from within the Territory to Venezuela. *Id.* at 750. The Circuit agreed that the word "export" in § 3.1(d) prohibited both "transfers [by MLL] of atazanavir to third parties that are 'present in the Territory,'" the scenario this Court had addressed in its August 12, 2013 Opinion, and also "transfers to third parties located anywhere when the transferee takes title to the products while those *products* are present in the Territory" and MLL reasonably believes the third party will then export these products outside. *Id.* Because the FAC's allegations were "not sufficient to support the inference that PAHO . . . took title to the atazanavir in the Territory," *id.* at 751, the Circuit remanded "so [that] BMS can seek leave to amend its complaint" consistent with the latter theory of liability, *id.* at 752.

On November 25, 2014, with this Court's leave, BMS filed the SAC. Dkt. 39. The SAC primarily pursued the theory of liability recognized as viable by the Second Circuit, to wit, that MLL had breached § 3.1(d) of the Agreement by selling atazanavir to a third party, PAHO, that was situated outside the Territory but took title to the atazanavir in the Territory, and that MLL "reasonably believ[ed] that PAHO may export the Products outside the Territory." *Id.* ¶¶ 16, 18, 37–38, 42–43. To support its claim that PAHO took title in the Territory, BMS alleged that the agreement between MLL and PAHO had been a "'shipping contract' pursuant to § 2-401 of the Uniform Commercial Code ["UCC"], under which title passes to the buyer at the time and place of shipment." *Id.* ¶ 11. BMS also attempted to plead a different theory: that PAHO was an exporter because it had "controlled the decision of where the product would be sent," *id.* ¶ 12, and by doing so "exported the product to the Venezuela Ministry of Health using a common carrier," *id.* ¶ 37.

4

On January 9, 2015, MLL filed a motion to dismiss. Dkt. 42. On May 13, 2015, after briefing and argument, the Court granted the motion.

The Court held that the SAC did not supply a "basis on which the Court could infer that title to the atazanavir transferred from MLL to PAHO in India." May 13 Opinion at 13. The Court concluded that the UCC, which, as noted, provides that "title passes to the buyer at the time and place of shipment," does not apply to the transactions between MLL and PAHO, *id.* at 11–12; BMS, in fact, had so conceded at oral argument. *See* Dkt. 72, at 25–27. Further, the Court noted, the Incoterms, which, as MLL had correctly argued, do apply to those transactions, do not address title transfer. *Id.* at 10–11. Finally, the Court noted, BMS's fleeting reference to Indian law, which it mentioned for the first time in a sentence in its brief on remand, did not suffice to sustain the SAC. *Id.* at 12–13.

The Court also rejected BMS's separate, new theory that PAHO had been an "exporter" because it had "controlled the decision of where the product would be sent." The Court held that this argument "distorts the ordinary meaning of the term 'export,'" was supported by "only conclusory allegations," and was inconsistent with the written agreement between MLL and PAHO, which the parties agreed the Court could consider. *Id.* at 13–16.

On June 3, 2015, BMS filed a motion for reconsideration, Dkt. 78, along with a memorandum of law, Dkt. 80 ("BMS Br."). BMS's argument was solely directed at the Court's treatment of Indian law. BMS argued that the Court's substantive assessment of Indian law had been necessary to its decision to dismiss the SAC, that the Court had misapplied Indian law, and that Indian law, properly construed, might support BMS's theory that title to the atazanavir had transferred from MLL to PAHO in India. On June 17, 2015, MLL submitted its opposition. Dkt.

84 ("MLL Br."). On June 24, 2015, BMS filed its reply. Dkt. 86 ("BMS Reply"). On July 14,

2015, the Court heard argument. *See* Transcript ("Tr.").

## II.    Applicable Legal Standards

The standard governing motions for reconsideration "is strict, and reconsideration will

generally be denied unless the moving party can point to controlling decisions or data that the

court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir.

2012) (citation omitted). Such a motion is "neither an occasion for repeating old arguments

previously rejected nor an opportunity for making new arguments that could have been

previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y.

2005); *see also Goonan v. Fed. Reserve Bank of N.Y.*, No. 12 Civ. 3859 (JPO), 2013 WL

1386933, at *2 (S.D.N.Y. Apr. 5, 2013) ("Simply put, courts do not tolerate such efforts to

obtain a second bite at the apple."). Rather, reconsideration is appropriate "only when the

[moving party] identifies an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel*

*Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted).

## III.    Discussion

BMS makes a single argument for reconsideration, based on the Court's treatment of

Indian law, to which BMS had fleetingly adverted in its brief in opposition to the motion to

dismiss the SAC. BMS argues that the Court's analysis of Indian law was erroneous. BMS also

argues that, although its pleadings had been silent as to Indian law and instead invoked the UCC

as the basis for its claim that title had transferred in India, it had not been required to plead

Indian law as the governing law. For the following reasons, BMS's argument does not provide

an appropriate basis for reconsideration of the Court's decision to dismiss the SAC.

As a threshold but dispositive matter, the facts pled in the SAC do not, themselves, state a claim. In relevant part, the FAC alleges that:

- MLL sold atazanavir to PAHO "with the reasonable belief that PAHO would export the product to Venezuela." SAC ¶ 10; *see also id.* ¶ 36 (MLL "sold approximately six months' worth of generic atazanavir to PAHO for the express purpose that PAHO export the product outside of India."); *id.* ¶ 38 (MLL sold atazanavir "with the reasonable belief (indeed, the intention) that PAHO would export the product outside the Territory.").

- "Upon information and belief, PAHO then took title to and/or control of the atazanavir while the product was in India." *Id.* ¶ 11; *see also id.* ¶ 13 ("PAHO, upon information and belief, controlled the product and acquired title to the atazanavir in India."); *id.* ¶ 16 ("PAHO once again assumed the risk of loss and took title to the atazanavir while the product was still in the Territory."); *id.* ¶ 37 (MLL "transferred to PAHO control and title to the atazanavir while the product was in India."); *id.* ¶ 42 ("In India . . . the title to the product and the risk transferred to PAHO.").

- "After taking title to and/or control of the atazanavir, PAHO exported the product from India to Venezuela." *Id.* ¶ 11; *see also id.* ¶ 12 ("PAHO then exported the product to the Venezuela Ministry of Health."); *id.* ¶ 16 (PAHO "exported the atazanavir outside the Territory to Venezuela."); *id.* ¶ 37 ("PAHO exported the product to the Venezuela Ministry of Health."); *id.* ¶ 42 ("Once PAHO took control of the drug, it subsequently exported the product in Venezuela."); *id.* ¶ 43 ("PAHO (through a common carrier) shipped approximately five months' supply of atazanavir to the Venezuelan Ministry of Health.").

- MLL "had actual knowledge of that exportation because it cooperated in the transfer of the product to Venezuela at PAHO's discretion." *Id.* ¶ 12.

As the Court has explained, these conclusory allegations as to title transfer are not adequate to state a claim. *See* May 13 Opinion at 15. Although the Court generally "must accept as true all of the allegations contained in a complaint," that tenet "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals" that are "supported by mere conclusory statements do not suffice." *Id.* BMS was required, but failed, to plead concrete factual allegations that support its conclusions as to the ultimate issues, namely, that PAHO took title to the atazanavir in India and thereafter exported the drugs to Venezuela.

Nor, as the Court explained, can the SAC's pleadings survive by invoking theories of liability apart from title transfer. The SAC refers repeatedly, for example, to "risk of loss." But risk of loss is a separate concept that does not equate to title transfer, the sole basis for liability left open by the Second Circuit. *Bristol-Myers Squibb Co.*, 586 F. App'x at 750–51. The SAC also refers repeatedly to the "control" that PAHO allegedly had over the export process. But the Second Circuit did not leave open that theory of liability and, in any event, a recipient's "control" over the export process does not, as a matter of law, make it an exporter. *See* May 13 Opinion at 13–16.[1]

---

[1] Finally, as the Court has noted, the SAC's allegations that PAHO "took title to and/or control of the atazanavir while the product was in India" and thereafter "exported the product from India to Venezuela," SAC ¶ 11, are inconsistent with other allegations in the SAC and with the agreement between MLL and PAHO, which was cognizable on the motion to dismiss. *See* May 13 Opinion at 15–16 & n.6. For instance, the SAC elsewhere alleges that "PAHO placed an order for, and *[MLL] agreed to ship*, 50,000 units of atazanavir to the Venezuelan Ministry of Health." SAC ¶ 15 (emphasis added). Similarly, the written agreement between MLL and PAHO assigned MLL responsibility for procuring a shipping contract and paying a common carrier to deliver the atazanavir to Venezuela. Dkt. 69, Ex. 1, at 15–16, Ex. 5, at 13–14.

The SAC, within its four corners, therefore did not plead any viable theory on which

BMS can obtain relief.

The issues, then, are whether (1) viewed under some body of governing law, the facts

pled support a theory of title transfer, and (2) BMS was required to identify that law in its

pleadings. Notably, although claiming on reconsideration that it had not had a duty to plead such

law, *see* BMS Br. 2, BMS's SAC had explicitly premised its theory of title transfer on the UCC,

*see* SAC ¶ 11. And at the argument on reconsideration, BMS was unable to articulate its theory

of title transfer without immediately invoking extrinsic legal principles (to wit, Indian law):

> MR. NIELDS: That is what we have to allege in the complaint, facts that give rise
> to a plausible claim. We allege those facts. One of the very important facts we
> allege is that this is a CIP, a contract, which we believed under both U.S. law and
> also Indian law gives rise to more than a plausible claim.
>
> . . .
>
> THE COURT: [W]hat facts in the complaint—again, facts in the complaint, put
> aside foreign law—what facts plead title transfer?
>
> MR. NIELDS: Part of the pleading that says this is a CIP contract. The Court has
> already said yes, and that means risk of loss goes over to the buyer. I'm now telling
> you that under Indian law those facts mean prima facie property, and the goods
> passes at the time the documents are tendered to the buyer.

Tr. 4, 11.

Accordingly, the Court reviews the specific bodies of law that could conceivably give

rise to a finding of title transfer here, and the adequacy of the SAC's pleadings as to them.

In the SAC, as noted, BMS relied on the UCC. It alleged that "PAHO's arrangement

with Mylan was a 'shipping contract' pursuant to § 2-401 of the Uniform Commercial Code,

under which title passes to the buyer at the time and place of shipment, or 'at the time and place

at which the seller contemplates his performance with reference to the physical delivery of the

goods.'" SAC ¶ 11. This allegation was consistent with the Second Circuit's decision, which

remanded the case based on BMS's "propos[al] that PAHO took title to the atazanavir in the Territory because its arrangement with [MLL] was a 'shipping contract' under the Uniform Commercial Code." *Bristol-Myers Squibb Co.*, 586 F. App'x at 751. And BMS relied on UCC § 2-401 in its brief opposing MLL's motion to dismiss. *See* Dkt. 61, at 7, 10, 13.

The Court, however, rejected this argument. It held that the UCC does not apply to the transactions between MLL and PAHO because those transactions "bore no relation to a UCC jurisdiction." May 13 Opinion at 12; *see also id.* at 11–12 (citing, *inter alia*, UCC § 1-301). BMS does not resist this conclusion.

MLL, for its part, argued that the transactions between MLL and PAHO were governed by the Incoterms. *See* Dkt. 43, at 6, 22. The Court agreed that the Incoterms applied. *See* May 13 Opinion at 10–11 & n.5. The Incoterms, however, do not address "the transfer of ownership of the goods." Incoterms 2010: ICC Rules for the Use of Domestic and International Trade Items (2010), at 6. Instead, the Incoterms provisions addressing CIP contracts explicitly assign responsibility for exporting the goods to the seller (MLL), and for importing the goods to the buyer (PAHO). *See id.* at 44–51. Applying the Incoterms therefore bypasses the title transfer issue and directly answers—in a way inconsistent with BMS's theory of contractual liability— the ultimate question of whether PAHO exported the goods.

Following the Court's rulings that the SAC does not state a claim under either the UCC or the Incoterms, BMS shifted its theory of liability yet again. In its motion for reconsideration, BMS now argues that, under Indian law, "title likely passed" from MLL to PAHO in India, and depicts this Court's rejection of that theory as necessary to its dismissal of the SAC. BMS Br. 3. This Hail Mary does not save the SAC, for several reasons.

First, if it intended to rely on Indian law as a basis for a finding of title transfer, BMS was required to raise Indian law earlier in this litigation. Under Federal Rule of Civil Procedure 44.1, "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." BMS, tellingly, did not provide such notice in any of its three complaints, in its briefs submitted in support of the FAC, in its briefs to the Second Circuit, or in a separate writing at any point during the first two and a half years of litigation. And a party reading the SAC—particularly given its overt reliance on the UCC—would have no reason to intuit that BMS's theory of title transfer was, *sub silentio*, dependent on applying Indian law to the facts pled. Rather, before the present motion for reconsideration, the only reference BMS made at any point to Indian law was a fleeting reference in its brief opposing MLL's motion to dismiss the SAC. In its entirety, BMS stated there that:

> Indian law likely yields the same result [as the UCC]. As one treatise explains: "If, under [a] contract, the seller delivers the goods to a carrier . . . for transmission to the buyer, without reserving the right to disposal, he is deemed to have unconditionally appropriated the goods to the contract and the property in the goods passes to the buyer." 2 REMEDIES FOR INTERNATIONAL SELLERS OF GOODS, at IND/13-14 (Dennis Campbell ed. 2009).

Dkt. 61, at 13–14. These three sentences did not constitute notice sufficient "to avoid unfair surprise." *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 585 (2d Cir. 2005). Nor was the issue raised in a "reasonably timely" manner. *Al Maya Trading Establishment v. Global Exp. Mktg. Co.*, No. 14 Civ. 275 (PAE), 2014 WL 3507427, at *3 & n.3 (S.D.N.Y. July 15, 2014).

Second and related, a motion for reconsideration is not "an opportunity for making new arguments that could have been previously advanced." *Associated Press*, 395 F. Supp. 2d at 19. Submitting new authority in support of such a motion is appropriate only where there is "an intervening change of controlling law" or "new evidence." *Kolel Beth Yechiel Mechil of*

11

*Tartikov, Inc.*, 729 F.3d at 104.   In seeking reconsideration, BMS has come forward citing

decades-old opinions to argue an issue (title transfer) that has been front-and-center in this case for

many months.  This BMS may not do.  The Second Circuit's decision focused the parties' attention

on title transfer, and BMS, in fashioning the SAC, chose to identify the UCC as the law governing

that transfer.  BMS's conduct of the case reflects a strategic decision to pursue a theory of liability

grounded in the UCC rather than Indian law.

That BMS has come to rue that decision does not permit it to change course long

afterwards.  MLL has exposed as deficient each of BMS's serial theories of liability: (1) the

broad theory of contractual liability articulated in the FAC but rejected by this Court and the

Second Circuit, (2) the UCC-based title-transfer theory argued, for the first time, before the

Second Circuit, and included in the SAC on remand, and (3) the alternative theory of "control"

over the export process also developed on remand.  BMS's reliance on Indian law is effectively a

fourth bite at the apple, developed long after its SAC was filed.  "Simply put, courts do not

tolerate such efforts."  *Goonan*, 2013 WL 1386933, at *2.

Third, the Court's decision to grant MLL's motion to dismiss the SAC did not turn on the

Court's assessment of Indian law.  As the Court explained, BMS's pleadings were deficient, and

"BMS's statement in its brief about the law of India is mere speculation that cannot sustain the

SAC."  May 13 Opinion at 12.  Although the Court—in an attempt to comprehensively address

all of BMS's arguments, in the interest of thoroughness and care—briefly discussed Indian law, a

reading of the Court's decision dismissing the SAC makes evident that the Court's commentary

on that subject was not essential to the decision.  The authorities BMS cites in its motion for

reconsideration therefore cannot "alter the Court's conclusion," Tr. 2, and the paragraph of dicta

regarding Indian law in the Court's May 13 Opinion, even assuming *arguendo* that it was erroneous, does not provide a basis for reconsideration.

Fourth and finally, BMS, tellingly, does not argue that the SAC would state a claim if the Court applied Indian law. Rather, BMS merely states that it is "not always easy" to tell when title transferred under Indian law, but title "likely" or "appears" to have transferred in India. BMS Br. 3–7; *see also* Tr. 27–28 (BMS's counsel) ("The principle that every case and every authority that we cited in our motion for reconsideration stands for, and it is a crucial principle, is that the fact that the buyer has the right to reject . . . does not mean that the property and the goods doesn't pass until the buyer accepts the goods."); Tr. 22–27 (MLL's counsel) (distinguishing the cases BMS cites in its brief). This inconclusive commentary, which in any event had no anchor in BMS's pleadings, does not "nudge[] [BMS's] claims across the line from conceivable to plausible." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).

Allowing this case to move forward based on BMS's motion for reconsideration would authorize discovery, and further explication of Indian law, in the hope that on some combination of these BMS would, eventually, be able to state a claim. But it is axiomatic that a plaintiff must state a claim *before* he is entitled to discovery. *Cf. Vail v. City of New York*, 68 F. Supp. 3d 412, 412 (S.D.N.Y. 2014) ("The fact that Plaintiff needs discovery to adequately state a claim for *Monell* is tantamount to an admission that he has, thus far, failed to state a *Monell* claim."); *K-Beech, Inc. v. Does 1–29*, No. 11 Civ. 3331 (JTB) (ETB), 2011 WL 4401933, at *1 (E.D.N.Y. Sept. 19, 2011) ("Because the Complaint does not plead a meritorious copyright infringement claim, it does not make sense to allow plaintiff the discovery it seeks."). This BMS has not done.

## CONCLUSION

The facts pled in the SAC do not state a claim.  And BMS's attempt to resuscitate the SAC by belatedly invoking Indian law is too little and too late.  For the reasons stated herein, BMS's motion for reconsideration is therefore denied.  The Clerk of Court is respectfully directed to terminate the motion pending at docket number 78, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 20, 2015
      New York, New York

14